# Exhibit 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| In re VEECO INSTRUMENTS INC. |
| SECURITIES LITIGATION |

Case No.: 7:05-md-1695 (CM)

# EXPERT REPORT OF VINITA M. JUNEJA, PH.D.

## APRIL 20, 2007

# CONTENTS

Contents......................................................................................................................i

List of Exhibits ........................................................................................................iii

I.     Introduction...................................................................................................1
    A. Qualifications...........................................................................................2
    B. Remuneration..........................................................................................3
    C. Materials Considered...............................................................................3

II.    Summary of Opinion ...................................................................................3

III.   History of Veeco Instruments Inc. and TurboDisc From 2003 Through the Alleged
    Class Period .................................................................................................6
    A. Veeco's Business Prior to the TurboDisc Acquisition...................................6
    B. TurboDisc Prior to its Acquisition by Veeco...............................................7
    C. Veeco's Acquisition of TurboDisc and the Related Events During and After the
       Alleged Class Period ..............................................................................8

IV.   Review of the Substantive Allegations From the Complaint In the Context of Publicly
    Available Information ................................................................................12
    A. Summary of Plaintiffs' Allegations..........................................................12
    B. Veeco's Alleged Misstatements of TurboDisc's Revenues.............................13
    C. Veeco's Alleged Misstatements of TurboDisc's Costs..................................15

V.    Forces Affecting Veeco's Stock Price During and After the Alleged Class Period .........15
    A. Veeco Experienced Declines in Most of Its Business Segments Over the Alleged
       Class Period ........................................................................................17
    B. Veeco's Other Business Segments Continued Experiencing Problems, and
       TurboDiscs's Sales Were Negatively Impacted by Industry Conditions in Late 2004.....19
    C. Veeco's Announcement of Accounting Issues at TurboDisc and the Restatement of
       Veeco's Financials ...............................................................................20

VI.   Statistical and Analytical Examination of Events Related to Complaint Allegations ......21
    A. The Event Study...................................................................................21
    B. Market Model......................................................................................23
    C. Analysis of Events and Stock Price Reaction from November 3-4, 2003........................24
    D. Analysis of Events and Stock Price Reaction from October 12-14, 2004........................24
    E. Analysis of Events and Stock Price Reaction from February 11-14, 2005 .....................26
    F. Analysis of Events after February 11-14, 2005 and Stock Price Reaction from March
       16-18, 2005 ..........................................................................................28

VII.  Alleged Inflation and Damages Assuming Liability.....................................................30
    A. Bounceback Rule .................................................................................31

    B. Prejudgment Interest............................................................................................32

VIII.  The Expert Report of Candace L. Preston....................................................................32
    A. Ms. Preston's Direct Costs ................................................................................33
    B. Ms. Preston's Indirect Costs..............................................................................33
    C. Ms. Preston's Compensation Calculations .........................................................36
    D. Conclusions on the Preston Report ....................................................................37

IX.    Conclusion ...............................................................................................................37

X.     Miscellaneous ...........................................................................................................39

**LIST OF EXHIBITS**

Exhibit 1.  Curriculum Vitae of Vinita Juneja ................................................................... 3

Exhibit 2.  Materials Considered ..................................................................................... 3

Exhibit 3.  Price and Volume Graph ................................................................................ 8

Exhibit 4.  Closing Price, Trading Volume and Key Events Related to TurboDisc .................... 8

Exhibit 5.  Equity Analyst Quotations Regarding Orders for TurboDisc and Aixtron .............. 14

Exhibit 6.  Equity Analyst Quotations Regarding the Relative Unimportance of Revenue
Timing Issues in the March 16, 2005 Restatement ......................................... 14

Exhibit 7.  Comparison of Veeco's MOCVD Order Intake to Aixtron's Order Intake First
Quarter of 2004 through Fourth Quarter 2005 ............................................... 14

Exhibit 8.  Equity Analyst Quotations and News Excerpts Relating to MOCVD Order
Recoveries for TurboDisc and Aixtron in the Aftermath of the Alleged Class Period ..... 15

Exhibit 9.  Equity Analyst Quotations and News Excerpts Relating to Veeco's TurboDisc
Gross Margin Strategy ............................................................................... 15

Exhibit 10. Closing Price vs. Peer Index and Nasdaq Composite Index ..................................... 17

Exhibit 11. Closing Prices vs. Comparable Companies ............................................................ 17

Exhibit 12. Daily Closing Prices vs. Aixtron AG ..................................................................... 19

Exhibit 13. Equity Analyst Quotations and News Excerpts Relating to Industry-wide
MOCVD Order Declines ............................................................................... 20

Exhibit 14. Market Model of Veeco's Stock Price Movements .................................................. 23

Exhibit 15. Market-Adjusted Price Reaction to Veeco News on November 3, 2003 .................... 24

Exhibit 16. Market-Adjusted Price Reaction to Veeco News on October 12, 2004 ..................... 25

Exhibit 17. Market-Adjusted Price Reaction to Veeco News on February 11, 2005 .................... 28

Exhibit 18. Equity Analyst Quotations and News Excerpts Regarding Data Storage Orders in
4Q2004 ................................................................................................... 28

Exhibit 19. Market-Adjusted Price Reaction to Veeco News on March 16, 2005 and
March 18, 2005 ........................................................................................ 29

Exhibit 20. Maximum Alleged Inflation in Veeco's Stock Price Over the Alleged Class
     Period.................................................................................................................................31

Exhibit 21. Alleged Inflation Pattern Suggested by Restatement Over the Alleged Class
     Period.................................................................................................................................31

Exhibit 22. Inflation Pattern Suggested by Restatement of Veeco's Pre-Income Tax Over the
     Alleged Class Period .......................................................................................................31

# I.    INTRODUCTION

1.    Counsel for Veeco Instruments Inc. ("Veeco" or "the Company"), a defendant in this matter, has asked NERA Economic Consulting ("NERA") to provide an expert report in connection with the Consolidated Amended Class Action Complaint[1] ("Complaint").  The Complaint allegations center around Veeco's acquisition of the TurboDisc Metal Organic Chemical Vapor Deposition ("MOCVD") business from Emcore Corporation ("Emcore") on November 3, 2003.[2]  Plaintiffs' allegations of misstatements and omissions focus on the alleged falsity of Veeco's financials, as revealed by the Company on February 11, 2005, when Veeco announced that it would have to restate its pre-tax earnings over the first three quarters of 2004 and postponed the release of audited results for the 2004 fourth quarter and full year 2004 pending completion of an internal investigation of improper accounting transactions at its TurboDisc division.[3]

2.    Plaintiffs assert claims for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.[4]  Specifically, plaintiffs claim that all purchases of Veeco's common stock between April 26, 2004[5] and February 10, 2005 were damaged by the alleged artificial inflation present due to the aforementioned misstatements and omissions.

3.    Counsel has asked us to review the allegations in the Complaint in the context of publicly available information on Veeco and TurboDisc during and after the period April 26, 2004 through February 10, 2005.  In doing so, we have considered events unrelated to the alleged fraud over the alleged class period that may have influenced Veeco's stock price.  We were also asked to calculate the extent to which Veeco's stock price was allegedly inflated by

---

[1]  Consolidated Amended Class Action Complaint, In re Veeco Instruments, Inc. Securities Litigation, United States District Court, Southern District of New York, Case No. 7:05-md-1695 (CM), dated November 7, 2005. Lead plaintiff in this action is the Steelworkers Pension Trust; plaintiffs as a whole include all other persons similarly situated.  Named defendants in this action include Veeco, Edward H. Braun, John F. Rein, John P. Kiernan, and R. Michael Weiss.

[2]  Complaint, paragraph 30.

[3]  Complaint, paragraph 2.

[4]  Complaint, paragraph 10.

[5]  Paragraph 1 of the Complaint alleges that the class period begins on November 3, 2003.  However, The Order and Decision Denying Defendants' Motion to Dismiss and Granting Lead Plaintiff's Motion for Class Certification in this matter dated March 21, 2006 indicates on page 37 that the court has certified that the

the alleged fraud, assuming liability in this matter. For the purposes of this report, we are assuming liability for any alleged fraud or recklessness on the part of defendants. However, this report should not be construed as endorsing that an alleged fraud occurred, or that defendants are liable.

4. Additionally, we have been asked to review and comment upon the Expert Reports of Dr. Steven Feinstein ("Feinstein Report") and Ms. Candace Preston ("Preston Report"). The Feinstein Report conveys Dr. Feinstein's analysis related to the Complaint, while the Preston Report attempts to quantify alleged damages due to Veeco itself from various directors of Veeco's board, as alleged in the shareholder derivative complaint.[6]

## A. Qualifications

5. Dr. Juneja is a Senior Vice President and the Chair of the Global Securities and Finance Practice of NERA. NERA was established in 1961 and now employs approximately 600 people in over 20 offices worldwide. The securities practice dates from the early 1970s, and employs a research staff of over 150 professionals with economics, finance, accounting and mathematics degrees. The practice's clients include major securities exchanges, risk managers, principals requiring valuation services, and parties in litigation and arbitration.

6. Dr. Juneja has a B.A. in economics from the University of Western Ontario and an M.A. and a Ph.D. in economics from Harvard University. She has taught courses in economics and business regulation, and currently serves as an arbitrator for the National Association of Securities Dealers. Her publications include chapters in books on the topics of securities litigation and arbitration and event studies. She has authored papers on the extent and nature of shareholder claims. She has testified at trials and at depositions and has submitted affidavits as an expert in United States federal and state courts, in Canadian court and in arbitrations. Her testimony, affidavits and depositions have covered numerous economic, financial and statistical issues arising in many securities, financial economics and valuation-related lawsuits, including

---

alleged class period runs from April 26, 2004 through February 10, 2005 for reasons indicated in that document.

[6] Consolidated Amended Verified Shareholder Derivative Complaint, Edward J. Huneke, August Schupp, III, and David Altman, derivatively and on behalf of Veeco Instruments, Inc., Plaintiff(s) vs. Edward H. Braun, et al., Defendants, United States District Court, Eastern District of New York, CV-05-1384 (LDW) (ETB), dated September 26, 2005 ("the Derivative Complaint").

2

many shareholder class action litigation actions and derivative litigation actions. Subjects covered in these testimonies, affidavits and depositions have included the materiality of news to reasonable investors, the impact of news on company share prices, the proper calculation of damages and other issues related to shareholder litigations and derivative actions. She has spoken frequently on the topics of event studies, issues, including the proper calculation of damages, in shareholder class action litigation and derivative litigation to audiences including risk managers, executives from publicly traded corporations, insurance industry participants and lawyers.

7. Her curriculum vitae listing publications from the past 10 years and testifying experience from the past 4 years is attached as *Exhibit 1*. In preparing this report, she has been assisted by others at NERA, who have worked under her supervision and review.

> *Exhibit 1.      Curriculum Vitae of Vinita Juneja*

## B. Remuneration

8. NERA is being compensated according to our hourly billing rates. Dr. Juneja's hourly billing rate is $585. The hourly rates for other NERA professionals involved in this case range from $110 to $585.

## C. Materials Considered

9. The materials considered in forming the opinions expressed in this report are listed in *Exhibit 2*.

> *Exhibit 2.      Materials Considered*

## II.   SUMMARY OF OPINION

10. Upon examination and analysis of certain case documents (such as parties' documents produced in discovery, transcripts of depositions, and pleadings) and other publicly available information in this matter, we conclude that:

> a. Many of the individual substantive allegations in the Complaint are inconsistent with information available from, or statements made by, the

press, investors, and equity analysts during and after the alleged class period.

b. There is evidence that analysts and investors did not view the restatements and other negative news during the alleged class period as indicative of management's active attempts to hide the failure of its TurboDisc strategy. As of the end of March 2005, barely two weeks after the restated financials were issued, equity analysts were still hopeful that management could be successful with its TurboDisc strategy, were hopeful about the company's general prospects, and did not assert that there was an active attempt to commit fraud on the part of the company or its management based on the restatements. As of the end of 2005, there was no indication that the TurboDisc segment had failed, or that equity analysts believed that it had failed.

c. The October 12, 2004 negative news and related announcements of an order shortfall with respect to aspects of Veeco's business (involving divisions other than TurboDisc as well as TurboDisc itself) were consistent with industry factors in the MOCVD business as evidenced by similar pressures faced by Aixtron, TurboDisc's main competitor.

d. Assuming that defendants are liable for the alleged fraud, we estimate that the alleged per-share inflation present in Veeco's stock price is, at a maximum, $3.09 per share towards the end of the alleged class period, and is a lower value before that. The $3.09 is based upon Veeco's stock price reaction to the announcement on February 11, 2005, controlling for any impact of market and industry factors on that day. If one were to take into account the fact that Veeco's stock price rose following the announcements of the actual restatement on March 16, the inflation calculation just prior to the end of the class period would be between $1.79 and $2.58 per share.

e. Even if the maximum alleged per share inflation at the end of the class period is $3.09, the alleged inflation at the beginning of the class period,

4

assuming liability, is no more than $0.85 and increases over the class period to reach a maximum of $3.09 as of October 25, 2004, if one uses Dr. Feinstein's methodology of apportioning inflation over time.

11. The Feinstein Report claims to determine loss causation[7], the materiality of the alleged misstatements and omissions, and the magnitude of alleged inflation in this matter. However, Dr. Feinstein has neither correctly nor completely applied widely accepted methodologies, and our findings contradict many of his conclusions:

    a. Dr. Feinstein has not performed a complete and correct loss causation analysis. He accounts for broad market and industry factors in his analysis of Veeco's stock price movement specifically from February 11-14, 2005, but ignores general industry movements as well as Veeco-specific factors unrelated to the alleged fraud during the alleged class period.

    b. Dr. Feinstein has not conducted a thorough analysis, as he limits his analysis to an event study of the February 11-14 events and associated stock price reaction. A more thorough analysis indicates that there were events on other dates that may be indicators of an overreaction by the market to the February restatement news.

    c. Dr. Feinstein's purportedly conservative assumptions are not so. He implies that he has left out factors that may increase alleged inflation, when a thorough analysis of these factors indicates that there should be no addition to his estimate of inflation per share.

12. The Preston Report overstates alleged damages to plaintiffs in the derivative suit as a result of several theoretical and methodological errors and shortcomings.

---

[7] Although Dr. Feinstein does not state that he is assuming fraud and liability on the instruction of plaintiff's counsel, presumably he has done so. As written, the Feinstein Report implies, without providing any basis, that Dr. Feinstein has found evidence of fraud and liability himself.

5

## III.    HISTORY OF VEECO INSTRUMENTS INC. AND TURBODISC FROM 2003 THROUGH THE ALLEGED CLASS PERIOD

### A.  Veeco's Business Prior to the TurboDisc Acquisition

13. Veeco has a history dating back to 1945, with its incorporation as a private entity by two Manhattan Project scientists.[8]  In the 1960's, Veeco merged with Lambda, a manufacturer of power supplies, and was purchased by the British company Unitech in the late 1980s.[9]  In 1990, Edward Braun, the COO of the company, led a management buy-out from Unitech.[10]  In 1994 the company completed an initial public offering on the Nasdaq National Market.[11] Veeco maintained its corporate headquarters in Woodbury, NY.[12]

14. Veeco has long been a company of diversified business segments and industries.[13] Prior to the acquisition of TurboDisc, and continuing throughout the alleged Class Period, Veeco designed, manufactured, marketed and serviced a variety of equipment used by manufacturers in the data storage, semiconductor, compound semiconductor/wireless and High Brightness-Light Emitting Diode ("HB-LED") industries.[14]  Analysts characterized Veeco as a supplier of "a broad range of process equipment and metrology products."[15]  Prior to the acquisition, the company operated in two business segments: Process Equipment and Metrology.[16]  In 2004, the Process Equipment segment split into Ion Beam and Mechanical Process Equipment and Epitaxial Process Equipment.[17]  These segments respectively contributed 34 percent and 12 percent to 2003 revenue, while Metrology contributed 53 percent to 2003 revenue.[18]  By industry, Data Storage contributed 32 percent, Compound

---

[8] Veeco Company website: http://www.veeco.com/company/history.php.

[9] Ibid.

[10] Ibid.

[11] Ibid.

[12] SEC Form 10-K for Veeco Instruments filed March 16, 2005, p. 15.

[13] Business segments refer to Veeco's internal classification of product lines.  Industry refers to Veeco's various customers.

[14] SEC Form 10-K for Veeco Instruments, Inc. filed March 16, 2005, p. 4.

[15] 11/4/2003, UBS Investment Research, "VECO: Expanding Addressable Market with Accretive Acquisition."

[16] SEC Form 10-K for Veeco Instruments, Inc. filed March 12, 2004, p. F-35.

[17] SEC Form 10-K for Veeco Instruments, Inc. filed March 16, 2005, p. 4.

[18] Ibid., p. 25.

6

Semiconductor/Wireless 14 percent, Semiconductor 14 percent, and Research and Industrial 39 percent.[19]

15. In the third quarter of 2003, Veeco experienced a sequential (i.e. from the prior period, which in this case was the prior quarter) and year-over-year revenue decline and a year-over-year order decline.[20]  However, the company expected "order improvement in Q4 followed by a broader recovery in 2004."[21]  In the fourth quarter of 2003, Veeco experienced "a broad industry upturn across all of our core markets in all geographic regions," which represented "the start of a sustainable recovery cycle occurring after two years of historically low CapX [capital expenditure] investment."[22]

**B. TurboDisc Prior to its Acquisition by Veeco**

16. Before its acquisition by Veeco, TurboDisc represented a major segment of EMCORE Corporation ("Emcore"). Emcore is a New Jersey corporation established in 1984, offering a portfolio of compound semiconductor products.[23]  Prior to its divestiture of TurboDisc, Emcore consisted of a systems-related business, TurboDisc, and a materials-related business.[24]  Since its founding in 1984 the systems business was based on TurboDisc's proprietary MOCVD technology.[25]  Systems related revenues accounted for 40.9 percent of total Emcore revenues in 2002 and 71.0 percent of revenues in 2001.[26]

17. TurboDisc produced a large portion of Emcore's revenues as of 2003. In 2003 Emcore's systems revenues increased from 40.9 percent of total revenues to 46.6 percent.[27]

---

[19] Ibid.

[20] 10/27/2003, FD (FAIR DISCLOSURE) WIRE, "Q3 2003 Veeco Instruments Inc. Earnings Conference Call – Final."

[21] Ibid.

[22] 2/6/2004, FD (FAIR DISCLOSURE) WIRE, "Q4 2003 Veeco Instruments Inc. Earnings Conference Call – Final.

[23] SEC Form 10-K for EMCORE Corporation filed December 30, 2002, p. 4.

[24] Ibid., p. 7.

[25] SEC Form 10-K for EMCORE Corporation filed December 30, 2002, p. 10.

[26] Ibid., p. 38.

[27] SEC Form 10-K for EMCORE Corporation filed December 30, 2003, p. 14.

Through much of 2003 Emcore consistently reported quarterly revenue that was below analyst estimates.[28]

### C. Veeco's Acquisition of TurboDisc and the Related Events During and After the Alleged Class Period

18. On November 3, 2003, Veeco purchased Emcore's TurboDisc Metal Organic Vapor Deposition ("MOCVD") business for $60 million in cash at closing and up to an additional $20 million over two years.[29] According to analysts, this purchase complemented Veeco's existing Molecular Beam Epitaxy ("MBE") offerings and strengthened the Epitaxial Process Equipment segment.[30] Analysts commented that Veeco's strategy was to create a "one stop shopping" platform for epitaxial deposition solutions,[31] enabling Veeco "to provide equipment for both key compound semiconductor epitaxial deposition technologies."[32] *Exhibits 3* and *4* show Veeco's stock price performance and daily share volume over the alleged class period as well as selected major news stories about Veeco.

> *Exhibit 3.    Price and Volume Graph*
>
> *Exhibit 4.    Closing Price, Trading Volume and Key Events Related to TurboDisc*

19. The acquisition of TurboDisc provided Veeco an entry into the MOCVD market, which was twice the size of the MBE market.[33] This acquisition grew Veeco's addressable epitaxial deposition market to $230 million from $60 million.[34] TurboDisc's MOCVD systems are used in the production of compound semiconductor applications such as data and

---

[28] See Friedman Billings Ramsey, "EMKR Misses March Quarter; Lowering 2003 Estimates; Maintain Market Perform Rating," 8/8/2003; Friedman Billings Ramsey, "EMKR Reports Soft 4Q03 Results; Reiterate Market Perform Rating on Convertible Notes," 11/17/03.

[29] PR Newswire, "Emcore Sells TurboDisc® Business to Veeco Company Focused on Being World-Wide Leader of Broadband and Wireless Components," November 3, 2003 4:27 PM.

[30] See Wells Fargo Securities, "Veeco Instruments, Inc. Acquires Emcore's CVD Business," November 4, 2003, p. 1; Merrill Lynch, "Acquisition of MOCVD Business Makes Veeco One Stop EPI Shop," November 4, 2003, p. 2.

[31] Citigroup (SmithBarney), "VECO: Purchases Emcore's MOCVD Business," November 3, 2003, p. 1.

[32] Wells Fargo, "Veeco Instruments, Inc. Acquires Emcore's CVD Business" November 4, 2003, p. 1.

[33] Ibid.

[34] FD (Fair Disclosure) Wire, "Event Brief of Veeco MOCVD Transaction Conference Call – Final," November 3, 2003; Needham, "Veeco Instruments, Inc. Announces the Acquisition of Emcore's MOCVD Business; Maintain Buy," November 4, 2003.

telecommunications modules, cellular telephones and solar cells, as well as High Brightness Light Emitting Diodes ("HB-LEDs") used in lighting applications.[35]

20. Prior to the acquisition and throughout the alleged class period, TurboDisc's main competitor in the MOCVD market was Aixtron AG ("Aixtron"). Veeco mentioned Aixtron in its 10-K's as a competitor, and this relationship with Aixtron is also mentioned in Veeco conference calls with analysts.[36] On the day of the acquisition UBS noted that "Within the MOCVD market, Emcore competes primarily with Aixtron, which has about 60% market share."[37] This market structure remained generally consistent through the alleged class period with Aixtron having 63 percent of the MOCVD equipment market and Veeco having 22 percent in 2004.[38] Aixtron, which is headquartered in Aachen, Germany, was incorporated as a German limited liability corporation in 1983, and became publicly traded in 1997.[39] Aixtron's ordinary shares are principally listed on the Frankfurt Stock Exchange.[40] According to its SEC filings Aixtron "generates revenue from the sale and installation of MOCVD equipment, spare parts and maintenance services to our customers."[41]

21. After the acquisition Veeco reported strong order and revenue results through the first half of 2004. In the first quarter of 2004 reported sales were $94.5 million, up both

---

[35] SEC Form 10-K for Veeco Instruments, Inc. filed March 16, 2005, p. 11.

[36] Ibid., p. 14

"Veeco competes with process equipment manufacturers such as Anelva, Unaxis, Hitachi, Shimadzu, Riber, Aixtron and Oxford Instruments."

11/3/2003, FD (Fair Disclosure) Wire, "Veeco MOCVD Transaction Conference Call - Final" Edward H. Braun: "We believe we can gain market share versus Aixtron, a German company, who were [sic] competitor in MOCVD."

2/11/2005, FD (Fair Disclosure) Wire, "Event Brief of Q4 2004 Veeco Instruments Inc. Earnings Conference Call - Final"

"Q32. (Graham Tanaka, Tanaka Capital Management) But my question is in terms of price performance of the TurboDisc products vs. competitors, is there enough cushion there, or is there not enough cushion there to raise prices?

A. (Ed Braun) There is the pressure and sensitivity you are implying. Right now there's only one competitor. It is really Veeco and Aixtron. We sort of share the market."

[37] UBS, "VECO: Expanding Addressable Market with Accretive Acquisition," November 4, 2003, p. 3.

[38] SEC Form 20-F for Aixtron AG filed June 22, 2006, p. 30.

[39] SEC Form 20-F for Aixtron AG filed June 24, 2005, p. 13.

[40] SEC Form F-4 for Aixtron AG filed February 8, 2005, p.17.

[41] SEC Form 20-F for Aixtron AG filed June 24, 2005, p. 21.

9

sequentially and year-over-year.[42] As restated these first quarter sales were actually $90.9 million.[43] Total orders increased sequentially and year-over-year to $117 million.[44] However, both semiconductor and scientific research orders were down sequentially.[45] During this period reported gross margins at Veeco dropped year-over-year from 47.4 percent to 43.7 percent "attributable principally to the significant mix shift to process equipment tools which have a lower average gross margins [sic]."[46] As later restated, the gross margins were in fact somewhat lower, 42.1 as opposed to 43.7 percent.[47] In the second quarter of 2004 reported sales were $102.9 million, up both sequentially and year-over-year.[48] As later restated, sales were $99.2 million.[49] Total orders increased sequentially and year-over-year to $124.7 million. However, data storage orders (i.e. non-TurboDisc equipment) declined sequentially.[50] During this period reported gross margins company-wide dropped year-over-year to 44.1 percent from 44.6 percent, "principally due to the sales, mix shift to process equipment tools."[51] As later restated, gross margins company-wide were 41.2 percent.[52] In both of these periods, Veeco's

---

[42] FD (FAIR DISCLOSURE) WIRE, "Q1 2004 Veeco Instruments Inc. Earnings Conference Call Final," 4/26/04.

[43] SEC Form 10-K for Veeco Instruments filed March 16, 2005, p. 44.

[44] FD (FAIR DISCLOSURE) WIRE, "Q1 2004 Veeco Instruments Inc. Earnings Conference Call Final," 4/26/04.

[45] Ibid.

[46] SEC Form 10-Q for Veeco Instruments filed May 3, 2004, p. 12.

This gross margin excludes the impact of a $1.5 million charge related to the acquisitions of TurboDisc and Aii. $43.7\% = (39,838,000 + 1,500,000) / 94,487,000$

[47] Applying the same formula to the restated revenue and gross profit numbers: $42.1\% = (36,798,000 + 1,500,000) / 90,863,000$

See SEC Form 10-K for Veeco Instruments filed March 16, 2005, p. 44.

[48] FD (FAIR DISCLOSURE) WIRE, "Q2 2004 Veeco Instruments Inc. Earnings Conference Call Final," 7/26/2004.

[49] SEC Form 10-K for Veeco Instruments filed March 16, 2005, p. 44.

[50] Ibid.

[51] FD (FAIR DISCLOSURE) WIRE, "Q2 2004 Veeco Instruments Inc. Earnings Conference Call Final," 7/26/2004.

[52] $41.2\% = 40,915,000 / 99,246,000$

See  SEC Form 10-K for Veeco Instruments filed March 16, 2005, p. 4.

10

compound semiconductor business, which includes TurboDisc, had a sequential increase in orders. [53]

22. After the market close on October 12, 2004, Veeco announced preliminary results for the third quarter of 2004. Veeco announced that third quarter orders were expected to be $80 million, compared to $125 million in the second quarter of 2004, and revenues were expected to be $93 million, compared to $103 million in the second quarter of 2004. [54] Additionally Veeco announced that orders for MOCVD equipment had dropped 70 percent sequentially.[55] On October 25th Veeco reported sales of $92.4 million.[56] As later restated, sales were $97.4 million.[57] On November 4, 2004 Aixtron reported its third quarter earnings, including a sequential decrease in orders of 30 percent.[58]

23. On February 11, 2005, Veeco announced that it would postpone the release of full financial results for 2004 pending the completion of an internal investigation of improper accounting practices at TurboDisc.[59] The company announced that the investigation would focus principally on the value of inventory, accounts payable and certain revenue items, and that the expected pre-tax earnings impact was between $5.5 million and $7.5 million.[60] On March 16, 2005 Veeco announced the completion of the internal review and restated results for the first nine months of 2004, resulting in a $10.2 million decrease to pre-tax earnings, including $8.1 million related to inventory, accruals and accounts payable as well $2.1 million due to revenue recognition issues. [61]

---

[53] FD (FAIR DISCLOSURE) WIRE, "Q1 2004 Veeco Instruments Inc. Earnings Conference Call Final" and 7/26/04, FD (FAIR DISCLOSURE) WIRE, "Q2 2004 Veeco Instruments Inc. Earnings Conference Call Final," 4/26/04.

[54] Business Wire, "Veeco Provides Preliminary Third Quarter Results," 10/12/2004, 6:00 PM.

[55] Ibid.

[56] Business Wire, "Veeco Reports Third Quarter and Nine Month 2004 Results," 10/25/2004, 7:00 AM.

[57] SEC Form 10-K for Veeco Instruments filed March 16, 2005, p. 44.

[58] Reuters News, "Aixtron misses Q3 sales forecasts, cuts outlook," 11/4/2004, 1:44 AM (EST).

[59] Business Wire, "Veeco Provides Financial Update; Postpones Earnings Release Pending Internal Investigation of TurboDisc Accounting," 2/11/2005, 7:00 AM.

[60] Ibid.

[61] Business Wire, "Veeco Reports Financial Results for Fourth Quarter and Year-Ended 2004; Completes Internal Investigation of TurboDisc Accounting and Restatements of Nine Month 2004 Results," 3/16/05, 7:00 AM.

## IV.    REVIEW OF THE SUBSTANTIVE ALLEGATIONS FROM THE COMPLAINT IN THE CONTEXT OF PUBLICLY AVAILABLE INFORMATION

### A. Summary of Plaintiffs' Allegations

24. Plaintiffs allege in the Complaint that Veeco misled investors regarding TurboDisc's prospects, inflating its results over the alleged class period, and eventually restating its pre-tax income by $10.2 million. Among the specific allegations in the Complaint are the following:

> a. "Contrary to their public statements, defendants knew that there was no possible way that Veeco could achieve 'synergies' with TurboDisc."[62]
>
> b. "... defendants hoped to increase TurboDisc's profitability by gambling that Veeco could manufacture component parts in-house instead of buying them."[63]
>
> c. "... defendants sought to increase TurboDisc's reported margins and profits by initiating an experimental program of building generic MOCVD reactors on speculation, with the hope that they could later be customized to a customer's specifications... The speculative venture result[ed] in an accumulation of virtually worthless machines...."[64]
>
> d. "...Veeco improperly recognized revenue on machines that had not yet been sold. Veeco further improperly recognized revenue under a Transitional Services Agreement..."[65]

25. Plaintiffs allege that the above improprieties led to negative consequences for Veeco. Allegedly due to these failed strategies, the cost-cutting initiatives ultimately led to quality problems, which led to higher warranty costs, the loss of customers, and the build-up of unsaleable inventory.[66] Consequently, plaintiffs allege that Veeco's restatement

---

[62] Complaint, paragraph 33.

[63] Complaint, paragraph 34.

[64] Complaint, paragraph 35.

[65] Complaint, paragraph 36.

[66] Complaint, paragraph 37.

announcements on February 11, 2005 and March 16, 2005 were in fact a belated disclosure that its revenues were overstated, its costs were understated, and its inventory should have been written down earlier.[67]

26. We review the allegations in the context of publicly available information, and conclude that publicly available information casts substantial doubt on their validity. Even after the original class action complaints were filed against Veeco in mid-February 2005, analysts did not then or thereafter express concern over the credibility or integrity of management. They did not even mention the lawsuit or any of the allegations in their discussion of the restatement.[68] Moreover, as the following sections will show, equity analysts characterized the restatement in very different terms from the Complaint, and these characterizations are in direct conflict with many of the allegations.

## B. Veeco's Alleged Misstatements of TurboDisc's Revenues

27. The Complaint includes allegations regarding revenue recognition. Among the allegations is the statement that:

> On April 26, 2004, Veeco issued a press release announcing that it received an order in excess of $10 million for multiple TurboDisc MOCVD production systems from Fujian Quanzhou Sanan Group Ltd., a manufacturer of high brightness light-emitting diodes (HB-LEDs) based in Fujian Province, China ... Revenue from the sale could not be recognized until the MOCVD reactor had been delivered to China... the Individual Defendants clearly understood the terms of the contract, but they were eager to accelerate the recordation of revenue.[69]

28. Plaintiffs intimate that this issue may have contributed to the alleged inflation in Veeco's stock price. However, an examination of equity analyst reports for both Veeco and Aixtron indicates that analysts considered actual orders to be much more important than the timing of revenue recognition in determining the performance of these companies. The

---

[67] Feinstein Report, paragraphs 117-19.

[68] PR Newswire, "Shareholder Class Action Filed on Behalf of Shareholders of Veeco Instruments Inc by the Law Firm of Schiffrin & Barroway, LLP," February 15, 2005. 4:58 PM.

We reviewed all available analyst reports from Thompson/Investext via Alacra and Reuters Knowledge over the months of February and March 2005. The investment banks represented in this sample include: Banc of America, Citigroup Smith Barney, D.A. Davidson & Co., Merrill Lynch, Merriman Curhan Ford & Co., Needham, Punk Ziegel & Company and W.R. Hambrecht & Co.

[69] Complaint, paragraphs 57-59.

13

analysts were concerned about the validity of the orders and the fact that they would eventually be booked as revenues rather than about when the revenues were booked (as long as they were booked eventually). For example, several analysts explicitly used orders to predict revenues.[70] *Exhibit 5* presents quotes from analysts which indicate analysts' concern about orders.

> Exhibit 5.    *Equity Analyst Quotations Regarding Orders for TurboDisc and Aixtron*

29. Further, some analysts did not appear to consider the revenue restatements to be important, and focused instead on the cost issues. For instance, a March 16, 2005 Citigroup report states, "All of the earnings reductions come as a result of gross margin issues in the TurboDisc MOCVD division acquired from Emcore in November 2003. We note that although revenue was restated for 2004, this was due to adjustments for improper timing of revenue recognition, and did not affect the cumulative amount of revenue recognized in FY2004."[71] There are many other examples of the general analyst sentiment regarding this issue in *Exhibit 6*.

> Exhibit 6.    *Equity Analyst Quotations Regarding the Relative Unimportance of Revenue Timing Issues in the March 16, 2005 Restatement*

30. Plaintiffs' allegations that revenues suffered due to lower quality products and customer dissatisfaction are not supported by equity analysts. In Section V of this report, we present information on how orders suffered due to factors unrelated to the restatements. Analysts explained the order shortfalls as being due to overall industry demand factors, and did not mention the allegations regarding lower quality products and customer dissatisfaction, even after the original complaints were filed in this action. Also, in the aftermath of early 2005, equity analysts for both Veeco and Aixtron expressed sentiments that orders were recovering for both companies. *Exhibits 7* and *8* present publicly available discussion about orders for TurboDisc and Aixtron during and after the class period.

> Exhibit 7.    *Comparison of Veeco's MOCVD Order Intake to Aixtron's Order Intake First Quarter of 2004 through Fourth Quarter 2005*

---

[70] D.A. Davidson & Co., "Orders Improvement Continues, Led By Semiconductor and High-Brightness LEDs Reducing Estimates Slightly, Maintaining BUY Rating," 7/27/04: "Recent order strength reaffirms our revenue estimates for the next 18 months."

[71] Citigroup, "VECO: All the Bad News," March 16, 2005.

14

> Exhibit 8.    *Equity Analyst Quotations and News Excerpts Relating to MOCVD Order Recoveries for TurboDisc and Aixtron in the Aftermath of the Alleged Class Period*

## C. Veeco's Alleged Misstatements of TurboDisc's Costs

31. The Complaint attributes the cost issues within the restatement to lower quality products and a failure of Veeco's strategy to integrate TurboDisc's operations. As with the revenue issues, plaintiffs' allegations are contradicted by statements made by equity analysts. Analysts did not characterize the restatement as an indication that Veeco had lied about its TurboDisc prospects, or that its strategy of integrating TurboDisc had failed. Rather, they characterized the cost issues as a temporary item of bad news, and reacted optimistically to the actual restatement on March 16, 2005. As of the end of 2005, analysts remained optimistic that Veeco had made great strides with its TurboDisc strategy, and viewed the acquisition and integration as having been largely successful. *Exhibit 9* presents analysts' discussion of TurboDisc's Gross Margins Strategy.

> Exhibit 9.    *Equity Analyst Quotations and News Excerpts Relating to Veeco's TurboDisc Gross Margin Strategy*

## V.    FORCES AFFECTING VEECO'S STOCK PRICE DURING AND AFTER THE ALLEGED CLASS PERIOD

32. If one examines Veeco's stock price performance relative to that of its peers over the class period, it is clear that the Veeco stock price closely tracked the performance of its competitors during a good part of the class period. In addition, the Veeco stock price closely tracked that of its closest competitor in the TurboDisc arena, Aixtron. See *Exhibits 11* and *12*. In addition, comments from equity analysts confirm what the graphs indicate – that industry forces are affecting Veeco's performance throughout the class period. The Feinstein Report addresses two main factors as influencing Veeco's stock price over the alleged class period. First, Dr. Feinstein considers the alleged fraud as having an impact. However, beyond the alleged fraud, Dr. Feinstein limits his loss causation analysis to the impact of broad market and what Dr. Feinstein characterizes as industry factors on Veeco's stock price reaction solely from February 11-14, 2005. Dr. Feinstein does not examine other issues relating to Veeco and TurboDisc that were unrelated to the alleged fraud which might still have depressed Veeco's stock price and which are clearly indicated by an examination of the stock price performance of

15

Veeco's competitors and by a review of the discussion of equity analysts following the company and the industry. Dr. Feinstein never once mentions TurboDisc's chief competitor, Aixtron, in his analysis.

33. The Feinstein Report also characterizes Veeco's general price decline over the alleged class period as being significantly tainted by the alleged TurboDisc fraud.[72] However, it ignores the fact that TurboDisc comprised only a small portion of the Veeco entity at any given point in time. At market close on November 3, 2003, just after the acquisition of TurboDisc for $60 million in cash and up to an additional $20 million over two years, Veeco's total market capitalization was approximately $773 million, implying that TurboDisc represented just over 10 percent of the combined entity at the acquisition. Consequently, when examining the decline in Veeco's price from over $25 at the start of the alleged class period to under $15 in the weeks just following the alleged class period, one cannot automatically attribute the more than $10 decline to TurboDisc alone, whether or not there was fraud. In fact, since TurboDisc represented just over 10 percent of the Company's value, even if TurboDisc became completely worthless immediately following the acquisition, that would only explain a decline of about $2.50 at that time.

34. We have examined publicly available information over the alleged class period, and have found that many equity analysts concluded that there were problems with TurboDisc's business that were unrelated to the alleged fraud. For example, a December 23, 2004 Needham report states:

> We continue to rate the shares of Veeco Instruments as Hold. We are making adjustments to our estimates for FY2004 and FY2005 to $0.39 per share and $0.52 per share respectively down from $0.41 and $0.73 respectively. Our revisions are based on the weak industry-wide conditions, particularly in the HBLED/wireless and data storage industries. The decline in business conditions experienced by Veeco is similar to other companies in the semiconductor, data storage and HB-LED/wireless industries.

35. We explore this issue in more detail below, but there are numerous additional instances where equity analysts attributed Veeco's general decline over the alleged class period to many factors unrelated to the alleged fraud.

---

[72] Feinstein Report, paragraphs 112-17: "The Alleged Fraud May Have Caused More of Veeco's Overall Price Decline ... Protracted Decline in Veeco Stock Price Following the Class Period."

16

## A. Veeco Experienced Declines in Most of Its Business Segments Over the Alleged Class Period

36. Although Dr. Feinstein compiles a set of comparable companies, he ignores the strong correlation that these companies' stock prices had with Veeco over the first part of the alleged class period. Instead, he implies without support that much of the decline over the alleged class period may have been due to the alleged fraud.[73] As *Exhibits 10* and *11* of this report show, until mid-October of 2004, many of the comparable companies cited by Dr. Feinstein as comparables exhibited very similar stock price movements to Veeco. This is consistent with the fact that Veeco experienced problems with its other segments in the first part of the alleged class period, another point ignored by Dr. Feinstein.

> *Exhibit 10.*    *Closing Price vs. Peer Index and Nasdaq Composite Index*
>
> *Exhibit 11.*    *Closing Prices vs. Comparable Companies*

37. On April 26, 2004 Veeco announced weak semiconductor and scientific research orders. In the first quarter of 2004 semiconductor orders were $10.1 million, down 41 percent sequentially.[74] This led Banc of America analyst Mark Fitzgerald to believe that "this sector will be tracking around $13-15 million per quarter in 2004 … because capacity buys will depend on end-markets recovery, which we are expecting to be a drawn out story at much slower rate."[75] During this quarter scientific research orders were down 26 percent sequentially.[76] The scientific research segment, which is highly dependent on government spending, "remained relatively flat."[77] However, analysts worried that government spending "could be reduced given a weakening economy."[78] Specifically, analysts were concerned about the impact of a slowdown in Chinese government spending.[79]

---

[73] Feinstein Report, paragraph 113: "If some of the price decline on 12 October 2004 had been dissipation of fraud-induced inflation, for example, or if there had been non-public discovery of some of the information concealed from the public during the class period, some of the additional price decline may actually have been dissipation of inflation caused by the alleged fraud."

[74] Veeco Instruments Inc. Earnings Conference Call – Final, FD (Fair Disclosure) Wire, 26 April 2004, Q1 2004.

[75] Banc of America Securities, "Tyco-it is," 4/26/04.

[76] Veeco Instruments Inc. Earnings Conference Call – Final, FD (Fair Disclosure) Wire, 26 April 2004, Q1 2004.

[77] Citigroup, "VECO: Strong Quarter, Guidance Light," 4/26/04.

[78] Ibid.

[79] Banc of America Securities, "Tyco-it is," 4/26/04.

17

38. During the second quarter of 2004, Veeco experienced a large decline in its data storage prospects. On April 26, Citigroup analyst Glen Yeung stated that the "greatest risk to Veeco's model…are data storage related revenues, given recent announcement by major players in that market regarding inventory and demand." [80] This concern materialized in the second quarter when Veeco announced that data storage orders had fallen by what analysts called "a whopping 41 percent sequentially" in a traditionally strong quarter, due to reduced spending.[81] Further, data storage customers revised their outlook for the third quarter downward as they experienced weak results. [82]

39. During the first and second quarters of 2004 Veeco experienced a product mix shift toward lower margin process equipment, which also caused analysts to lower their earnings expectations. In the first quarter of 2004 the drop in semiconductor and scientific research orders led to a decrease in gross margins for Veeco: "Overall, process equipment represented 73% of the Q1 order book. Metrology bookings declined in Q1, with a fall in orders from both semiconductor and research customers. Based on these trends, we now expect gross margin to be below our previous expectations for the next several quarters."[83] This is because Veeco's process equipment business (data storage and compound semiconductor) had gross margins in the low 40 percent range, while metrology (semiconductor and scientific research) had gross margins in the mid-50 percent range.[84] As of the first quarter of 2004 D.A. Davidson believed that the mix would "remain in favor of process equipment sales" over the course of 2004. [85] The lowered gross margin expectations led D.A. Davidson to lower their earnings estimates, despite improving orders.[86] The product mix shift toward process equipment and the resultant

---

[80] Citigroup, "VECO: Strong Quarter, Guidance Light," 4/26/04.

[81] Banc of America, "Slippage in its 2004 margins goal," 7/26/04.

[82] Hoefer & Arnett, "Veeco Instruments (VECO-$20.38) Buy," 7/26/04.

[83] D.A. Davidson & Co., "Veeco Reports Significant Bookings Improvement, Mix Shift Towards Process Equipment, Reducing Earnings Estimates on Lower Gross Margin Profile, Maintaining BUY Rating," 4/27/04.

[84] D.A. Davidson & Co., "Veeco Reports Significant Bookings Improvement, Mix Shift Towards Process Equipment, Reducing Earnings Estimates on Lower Gross Margin Profile, Maintaining BUY Rating," 4/27/2004.

[85] Ibid.

[86] Ibid.

negative impact on gross margins continued into the second quarter of 2004, and were expected to last through the end of 2004.[87]

### B. Veeco's Other Business Segments Continued Experiencing Problems, and TurboDiscs's Sales Were Negatively Impacted by Industry Conditions in Late 2004

40. A review of the Feinstein Report indicates that Dr. Feinstein has also not conducted any research on TurboDisc's principal MOCVD competitor Aixtron, despite the fact that Aixtron is noted as the main MOCVD competitor to TurboDisc in several depositions in this matter.[88] As a result, the Feinstein Report ignores major industry-wide factors affecting Veeco's stock price during the Alleged Class Period, as evidenced by Aixtron's results. *Exhibit 12*, a chart of Aixtron's returns pegged to Veeco at the beginning of the alleged class period, suggests that Aixtron experienced many of the same problems as Veeco towards the end of 2004.

*Exhibit 12.    Daily Closing Prices vs. Aixtron AG*

41. From October 12, 2004 through early 2005 Veeco experienced a sharp downward reduction in order intake and sales. On October 12, 2004, after market close, Veeco announced that third quarter orders were expected to be $80 million, as compared to $125 million in the second quarter of 2004, and company guidance of $125-130 million.[89] Veeco announced that, as part of this shortfall, TurboDisc's MOCVD orders had decreased about 70 percent.[90] Veeco attributed these shortfalls to "weak industry-wide capital equipment conditions", with MOCVD orders being dramatically affected by "spending freezes initiated by many Asian customers at the end of the quarter."[91]    Additionally, Veeco's data storage and semiconductor orders

---

[87] See Citigroup, "VECO: 2Q04 (June) Results In-Line," 7/26/2004; Merrill Lynch, "Upside to 2Q Results, 2H04 Outlook Meets Expectations," 7/27/04.

[88] See "DEPOSITION of a Non-Party Witness, BRUCE HUFF", In Re: VEECO INSTRUMENTS, INC., SECURITIES LITIGATION, 12/20/2006, 10:05 AM, p. 88.

"Videotape Deposition of BRUCE J. HUFF", In Re: VEECO INSTRUMENTS, INC., SECURITIES LITIGATION, 2/9/2007, 9:52 AM, pp. 94, 279-280.

"Videotaped Deposition of Edward Braun", In Re: VEECO INSTRUMENTS, INC., SECURITIES LITIGATION, 2/23/2007, 9:57 AM, pp. 28-29, 47.

[89] Business Wire, "Veeco Provides Preliminary Third Quarter Results," 10/12/2004, 6:00 PM.

[90] Ibid.

[91] Ibid.

declined approximately 30 percent as compared to the second quarter.[92]  The decline in
Veeco's data storage and semiconductor businesses obviously had nothing to do with the
alleged fraud.  However, a substantial decline in MOCVD orders was also experienced by
TurboDisc's main competitor, Aixtron.

42. On November 4, 2004 Aixtron announced third quarter results, missing both sales
and orders forecasts, and cutting guidance for the year.[93]  Order intake for the quarter fell 30
percent from the previous quarter to €25.9 million,[94] "worse than the 20 percent drop predicted
by the average of six analysts in a Reuters poll."[95]  This trend continued through the fourth
quarter of 2004 when Aixtron again disappointed analysts with its weak order intake.[96]
Analysts believed that TurboDisc's MOCVD shortfall represented an industry-wide trend that
would adversely affect TurboDisc's largest MOCVD competitor, Aixtron.  As *Exhibit 13*
shows, this is in contrast to the Complaint's position that TurboDisc's order shortfall was due
to low quality products and customer dissatisfaction.

> *Exhibit 13.     Equity Analyst Quotations and News Excerpts Relating to
> Industry-wide MOCVD Order Declines*

## C. Veeco's Announcement of Accounting Issues at TurboDisc and the Restatement of Veeco's Financials

43. On February 11, 2005 Veeco postponed the release of audited fourth quarter and full
year 2004 results pending the completion of an internal investigation of improper accounting
transactions at TurboDisc.[97]  Veeco announced that the investigation would focus primarily on
the value of inventory, accounts payable, and certain revenue items.[98]  Additionally, Veeco

---

[92] Ibid.

[93] Reuters News, "Aixtron misses Q3 sales forecasts, cuts outlook," 11/4/2004, 1:44 AM (EST).

[94] Dow Jones International News, "Aixtron 3Q Revenue EUR30.4M Vs EUR21.5M," 11/4/2004, 1:36 AM (EST),

[95] Reuters News, "Aixtron misses Q3 sales forecasts, cuts outlook," 11/4/2004, 1:44 AM (EST).

[96] Auerbach Grayson/M.M. Warburg, "Disappointingly Poor Incoming Orders in Q4 2004.," 4/4/2005.

[97] FD (FAIR DISCLOSURE) NEWSWIRE, "Q4 2004 Veeco Instruments Inc. Earnings Conference Call – Final,"
2/11/2005.

[98] Ibid.

20

stated that the expected pretax impact to earnings of the restatement would likely be between $5.5 and 7.5 million. [99]

44. On March 16, 2005 Veeco completed its internal investigation of TurboDisc and announced audited fourth quarter 2004 results, as well as restated full year 2004 results. [100]  The restatement consisted of an $8.1 million decrease in pre-tax earnings related to inventory accruals and accounts payable as well as a $2.1 million decrease in pre-tax revenues due to the timing of revenue recognition. [101]  As previously discussed in section IV this restatement amounted to lower than expected gross margins.

## VI.    STATISTICAL AND ANALYTICAL EXAMINATION OF EVENTS RELATED TO COMPLAINT ALLEGATIONS

### A. The Event Study

45. In his analysis, Dr. Feinstein tests a single reaction period, or February 11-14, 2005, for statistical significance.  A complete analysis of causation and damages incorporates not only a market model and an event study that tests for statistical significance of specific dates, but generally requires a detailed examination of the fact pattern and timeline of events during and after the entire alleged class period.  Further, the statistical exercise is only the first component of a complete analysis of damages.  One should also examine the implications of the relevant fact pattern and timeline of events, and determine whether it is appropriate to attribute any or all of the entire price reaction on an alleged disclosure date to the alleged misstatement, and also whether other events and price reactions might shed light on the validity of the allegations and the magnitude of any alleged resultant inflation.

46. Financial economics is a body of theory and empirical research based on the scientific method.  There are objective statistical tests that are used in financial economics to determine whether or not a piece of information is, in fact, material.  If information is material, it would be expected to have a statistically significant impact on the price of the stock at the

---

[99] Ibid.

[100] FD (FAIR DISCLOSURE) NEWSWIRE, "Q4 2004 Veeco Instruments Inc. Earnings Conference Call – Final," 3/16/2005.

[101] FD (FAIR DISCLOSURE) NEWSWIRE, "Q4 2004 Veeco Instruments Inc. Earnings Conference Call – Final," 3/16/2005.

21

time that the information was disclosed. However, if a statistically significant price reaction can be associated with a particular announcement, that association is not sufficient to establish that the whole price reaction was due to any specific part of the announced information. To establish a connection between any specific part of the announced information and the price reaction, one would need to examine what part of the announced information was new and to what extent that information altered the total mix of information available.

47. A great deal of research in financial economics has focused on "event studies" as a scientifically rigorous way of separating a given stock price return into an idiosyncratic component and a component that can be explained using new information common to the whole industry and/or market. Courts have also stated that "failure to conduct a thorough 'event study' would be reason enough to exclude" an expert witness's report.[102]

48. An event study allows us to examine the impact of the allegedly corrective disclosure cited by Plaintiffs on Veeco's common stock price. If the disclosure of the prior allegedly misrepresented or omitted information had a statistically significant impact on the stock price, then the information revealed on that day may be considered material. If, on the other hand, a statistically significant stock price movement does not accompany the disclosure, then the allegedly withheld information could not have been material.

49. The event study technique is appropriate for testing the materiality of an alleged omission or misrepresentation, that is, whether the information would have been important to a reasonable investor and therefore would have affected the market price by a statistically significant amount if it were revealed. A number of academic papers have concluded that these techniques are appropriate for such questions.[103]

---

[102] *In re Executive Telecard*, 979 F. Supp 1021 (SDNY 1997) at 1027.

[103] See, for example, the following papers:

Bradford Cornell and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA L. Rev.* (1990), p. 883-84.

Daniel R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," 38 *Bus. Law.* 1 (1982).

A. Craig MacKinlay, "Event Studies in Economics and Finance," 35 *Journal of Economic Literature*, March 1997, p. 13-39.

## B. Market Model

50. In performing our event study, we first collected prices for the peer companies that Veeco analysts had identified as publicly traded companies comparable to Veeco, as well as companies that Veeco identified in its SEC filings. The stock price movements of these companies capture industry effects that could also have influenced Veeco's stock price. To measure the day-to-day price changes of Veeco stock, we used log returns.[104] We calculated an industry index whose stock price returns are calculated by applying equal weight to the stock price returns of the Veeco peer companies that analysts and the company had identified.[105] Again, we used log returns to measure the day-to-day change in stock prices. We then applied an estimation procedure known as an ordinary least squares regression in order to estimate a "market model." This procedure estimates the parameters of the underlying statistical relationship between the movements of the stock price and the movement of the peer index. *Exhibit 14* details the resulting market model.[106]

Exhibit 14.    <em>Market Model of Veeco's Stock Price Movements</em>

51. Using this statistical market model allows us to calculate, on any given day, the amount by which Veeco's price would be expected to change, in the absence of company-specific news, given the change in the value of the industry index on that day. For any particular day, we can use the model to estimate the industry and market-adjusted price reaction of Veeco common stock, that is, what proportion of the stock price movement on any day was specific to Veeco, as opposed to driven by factors impacting the industries in which Veeco does business or the market in general.

---

[104] This is defined as taking the natural log of the current day's price divided by the previous day's price. Veeco did not pay dividends over the relevant time period, so no dividend adjustment is needed for the returns.

[105] The index is comprised of the companies ADE Corporation, Applied Materials, ASM International N.V., Axcelis Technologies, FEI Company, FSI International Inc., KLA-Tencor, Mattson Technology Inc., Novellus Systems, Rudolph Technologies, Semitool Inc., Therma-Wave Inc., Trikon Technologies Inc., Varian Semiconductor, and Zygo Corp. The companies in the Peer Index were mentioned in Veeco's SEC filings or analyst reports and are limited to companies listed on American exchanges. None of the companies listed here paid dividends over the relevant time period, so no dividend adjustment is needed to calculate returns.

[106] NERA has calculated an equivalent model for Aixtron, and has examined Aixtron's common stock price reactions dates on which Aixtron has announced order shortfalls for their MOCVD business. As will become evident in the subsequent sections of this report, this limited market model and event study for Aixtron is relevant to NERA's interpretation of Veeco's price reactions over the alleged class period.

52. We use the market model to determine which part of the stock price movement is due to market and industry forces and which part is left unexplained by the model. One can then test whether the unexplained movement on a given day is statistically significant, i.e., whether statistically there is a high enough probability that the aberrant movement is caused by something other than chance.

53. Of course, merely determining statistical significance or insignificance does not represent the full extent of our analysis. We also examine the relationship between the relevant issues and fact patterns being tested, and the substantive events that occur on the dates being tested. In the following sections, NERA examines the dates relevant to the Veeco case, both for statistical significance of the stock price movements in reaction to news, and for the implications of each date for the allegations put forth in the Complaint.

## C. Analysis of Events and Stock Price Reaction from November 3-4, 2003

54. After market close on November 3, 2003, Veeco reported that it had purchased Emcore's TurboDisc MOCVD business.[107]

55. Since the announcement was made after the close on November 3, 2003, the earliest closing price that would incorporate the new information in that announcement would be the closing price on November 4, 2003.

56. *Exhibit 15* shows that the market-adjusted stock price reaction was statistically insignificant.

Exhibit 15.    *Market-Adjusted Price Reaction to Veeco News on November 3, 2003*

57. This suggests that the market did not view the acquisition as a clearly positive event. In fact, it suggests that the acquisition was not by itself expected to be an overwhelming factor in Veeco's overall profits.

## D. Analysis of Events and Stock Price Reaction from October 12-14, 2004

58. After the market close on October 12, 2004, Veeco announced:

---

[107] Business Wire, "Veeco Purchases Emcore's TurboDisc Business; Creates a Global Leader in Compound Semiconductor Deposition Technologies," 11/3/2003, 4:29 PM.

a. That third quarter orders were expected to be $80 million, well short of the company's $125-130 million guidance.[108]

b. That the order shortfall included a 70 percent drop in MOCVD orders versus the previous quarter.[109]

c. That third quarter revenues were expected to be $93 million versus the company guidance of $105-110 million, and that it projected fourth quarter revenues to be in the range of $90-100 million.[110]

d. That third quarter GAAP loss was expected to be between ($0.06) and ($0.04) per share.[111]

e. That third quarter earnings excluding amortization were expected to be $0.04 and $0.06 per diluted share.[112]

As a result of this announcement two analysts downgraded Veeco.

59. Since the announcement was made after the close on October 12, 2004, the earliest closing price that would incorporate the new information in that announcement would be the closing price on October 13, 2004.

60. *Exhibit 16* shows that the market-adjusted stock price reaction was statistically significant at the 5 percent level for two trading days.

*Exhibit 16.    Market-Adjusted Price Reaction to Veeco News on October 12, 2004*

61. Analysis of the news indicates that this reaction is unrelated to the alleged fraud. Not only were there substantial shortfalls in orders for Veeco's other business segments, but the order shortfall for TurboDisc was an industry-wide problem that also affected its main competitor Aixtron. On October 26, 2004, a UBS analyst discussed an industry-wide downturn in MOCVD orders, and an analysis of Aixtron's stock price reaction on that date shows it to be

---

[108] Business Wire, "Veeco Provides Preliminary Third Quarter Results," 10/12/2004, 6:00 PM.

[109] Ibid.

[110] Ibid.

[111] Ibid.

[112] Ibid.

negative and statistically significant at the 10 percent level.[113]  This suggests that investors viewed the information in the UBS report as being material to the company's prospects.[114]  Combined with the evidence from Section V of this report that analysts viewed the MOCVD industry as a whole experiencing an order shortfall, this suggests that the reasons independent of the eventual restatement announcements can explain the news on October 12, 2004.

62. Dr. Feinstein does not attribute any of the stock price reaction to the news on October 12, 2004 to the alleged inflation but he claims that "some of the price decline may have been dissipation of fraud-induced inflation" while providing no evidence to support this.[115]  Instead, Dr. Feinstein omits any detailed analysis of the events on this date, and states that he is being conservative in ignoring this date in his analysis without accounting for non-fraud related factors that were affecting companies in this industry.

63. However, calling his conclusion conservative is inappropriate.  At first glance, and if one assumes that the complaint allegations are valid, one might conclude that the October 12, 2004 news is possibly related to the alleged fraud.  This would not be a valid conclusion, because it is likely that the price drop was related to industry factors as evidenced by similar pressures faced by TurboDisc's main competitor, Aixtron.  Calling a failure to examine evidence conservative can serve only to suggest that there might be something else that could affect a conclusion, a suggestion that is incorrect in this instance.

## E. Analysis of Events and Stock Price Reaction from February 11-14, 2005

64. On February 11, 2005, Veeco announced:

---

[113] For the purposes of this calculation, NERA ran a market model for Aixtron using the TecDAX Index (a German stock index which tracks the performance of the thirty largest technology companies listed on the Frankfurt stock exchange) over the period October 1, 2003 to September 30, 2004.  The regression beta was 1.16, with a t-statistic of 12.01, which is significant at the 95 percent confidence level.  Aixtron AG's common stock price fell from $4.42 on 10/25/2004 to $4.22 on 10/26/2004.

[114] See 10/26/2004, 4:54 AM (EST), AFX International Focus, "STOCKWATCH Aixtron Slides as UBS Sets Downside Price Target," which comments "Aixtron AG were down sharply in early deals after UBS set a downside price target of 2.8 eur for the stock, compared to a previous objective of 3.7 eur, dealers said."

[115] Feinstein Report, paragraph 105.

a. An internal investigation of improper accounting transactions at TurboDisc, focusing on inventories, accounts payable and certain revenue items.[116]

b. That it would likely have to restate financials for the first three quarters of 2004 resulting in a $5.5 to 7.5 million impact to pre-tax earnings.[117]

c. That as a result of the restatement TurboDisc's costs for that period were higher.[118]

d. That orders exceeded expectations at $99 million versus company guidance of $85-$95 million, with most of the strength coming from the data storage sector.[119]

e. That full year 2004 results included orders of $420 million and revenues that were expected to be in the range of $383-390 million.[120]

f. That first quarter 2005 sales and orders were both expected to be in the range of $85-90 million.[121]

g. That it would record a fourth quarter 2004 non-cash valuation allowance of $50 million related to deferred tax assets.[122]

h. That it would record a fourth quarter 2004 charge of approximately $5.7 million related to staffing and other cost reductions.[123]

---

[116] Business Wire, "Veeco Provides Financial Update; Postpones Earnings Release Pending Internal Investigation of TurboDisc Accounting," 2/11/2005, 7:00 AM.

[117] Ibid.

[118] FD (FAIR DISCLOSURE) WIRE, "Q4 2004 Veeco Instruments Inc. Earnings Conference Call – Final," 2/11/2005.

[119] Ibid.

[120] Business Wire, "Veeco Provides Financial Update; Postpones Earnings Release Pending Internal Investigation of TurboDisc Accounting," 2/11/2005, 7:00 AM.

[121] Ibid.

[122] Ibid.

[123] 2/11/2005, FD (FAIR DISCLOSURE) WIRE, "Q4 2004 Veeco Instruments Inc. Earnings Conference Call – Final," 2/11/2005.

27

65. *Exhibit 17* shows that the market-adjusted stock price reaction was statistically significant at the 5 percent level for two trading days.

> Exhibit 17.    *Market-Adjusted Price Reaction to Veeco News on February 11, 2005*

66. This stock price reaction was largely in response to the announcement of the internal investigation and restatement. Although there was an item regarding data storage orders, *Exhibit 18* shows that equity analysts viewed this issue as merely being an earlier than expected temporary increase in orders caused by a previously predicted short-term demand from customers. This directly contradicts Dr. Feinstein's claims that there was substantial positive news on this date which might have had a positive impact on Veeco's stock price.

> Exhibit 18.    *Equity Analyst Quotations and News Excerpts Regarding Data Storage Orders in 4Q2004*

67. Further, the restatement occurred against the backdrop of industry-wide factors that continued to negatively affect MOCVD sales in general. On April 4, M.M. Warburg released a report emphasizing that Aixtron's lower than expected MOCVD orders in 2004 negatively affected its prospects.[124] An analysis of Aixtron's common stock price reaction on April 5, 2005 shows it to be statistically significant at the 5 percent level.[125] Although this issue is not highlighted in Veeco's case, this may be due to the fact that Veeco's restatement issues led to less coverage of a continuing decline in MOCVD orders, and its effect on TurboDisc's business. As a result, part of Veeco's stock price decline over the February 11-14, 2005 period may be explained by industry-wide factors, unrelated to the alleged fraud.

## F. Analysis of Events after February 11-14, 2005 and Stock Price Reaction from March 16-18, 2005

68. On March 16, 2005, Veeco announced:

---

[124] See Bloomberg News, "German Stocks Advance, Led by MAN; DaimlerChrysler, BMW Gain," 4/5/2005, 10:30 AM (EST). The article comments that "Aixtron AG (AIX GY), a maker of machines that coat semiconductors, dropped 8 cents, or 2.6 percent, to 3.05 euros, headed for a three-day drop of 8.7 percent. Michael Bahlmann, an analyst at M.M. Warburg in Hamburg, cut Aixtron's share recommendation to 'sell' from 'hold'," citing disappointing order intake in the fourth-quarter of 2004."

On March 31, 2005 Aixtron announced Fiscal Year 2004 results. See 3/31/05, 1:00 AM (EST), PR Newswire, "AIXTRON Announces Fiscal Year 2004 Financial Results."

[125] Aixtron AG's common stock price fell from $4.03 on April 4, 2005 to $3.76 on April 5, 2005.

a. The conclusion of the internal investigation and restated earnings for the first three quarters of 2004, lowering pre-tax earnings by $10.2 million, consisting of $8.1 million related to inventory, accruals and accounts payable and $2.1 million related to revenue recognition.[126]

b. Fourth quarter earnings excluding extraordinary items of 3 cents a share.[127]

69. *Exhibit 19* shows that the market-adjusted Veeco stock price reaction was positive and statistically significant at the 10 percent level on March 16, 2005. On March 17, 2005 one analyst who had earlier suspended coverage resumed coverage with a "Buy" recommendation. On March 18, another analyst raised his rating for Veeco from a "Market Perform" to a "Buy." The market-adjusted Veeco stock price rose on March 18 and was statistically significant at the 5 percent level[128].

*Exhibit 19.    Market-Adjusted Price Reaction to Veeco News on March 16, 2005 and March 18, 2005*

70. Analysts' commentary reflects their positive views of the restatement. Further, even in the wake of securities class action complaints filed after the February 11, 2005 announcement, equity analysts did not appear to put any stock in the Complaint allegations, instead appearing to be optimistic about Veeco's continuing attempts to improve TurboDisc's operations.[129]

---

[126] Business Wire, "Veeco Reports Financial Results for Fourth Quarter and Year-Ended 2004; Completes Internal Investigation of TurboDisc Accounting and Restatement of Nine Month 2004 Results," 3/16/2005, 7:00 AM.

[127] Ibid.

[128] See Merriman Curhan Ford & Co., "Resuming Coverage With a Buy Recommendation; Accounting Investigation Completed, Q4-04 Results Released," 3/17/05.

Also Punk Ziegel & Company, "Raising Rating to BUY at a $21 Price Target. Improvements Underway at TurboDisc," 3/18/05.

While on March 17, 2005 a Business Wire article at 4:00 PM noted an order for an Atomic Force Microscope (AFM), there is previous evidence of AFM order strength.

As noted in a February 11, 2005 WR Hambrecht analyst report: "VECO's AFM dominance undiminished. Checks confirmed VECO's management's assertion that KLA-Tencor's (KLAC: Buy) AFM tool had run into technical glitches at customer sites".

[129] See Section VII of this report detailing analyst reactions to the restatement and outlook on Veeco's TurboDisc strategy.

71. Indeed, the positive Veeco stock price reactions in March following the actual restatement suggest that the negative Veeco stock price reaction from February 11-14, 2005 may have been an overreaction to the news of the restatement, and potentially overstated the impact of the alleged fraud. If that were the case, the March stock price reactions would need to be taken into account to calculate the alleged inflation in the stock price, once the full information about the restatement was revealed. However, Dr. Feinstein does not take the impact of the actual restatement on the Veeco stock price into account in his analysis of the alleged inflation.

72. Further, Dr. Feinstein's claim that some of the post February 14, 2005 decline in Veeco's stock price might be attributable to the alleged fraud[130] is inconsistent with what is implied about damage calculation in the recent decision in the *Dura vs. Broudo* matter. As noted by the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627*, "[t]he statute thereby makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." Merely stating that the stock "continued to slide downward"[131] does not prove that the price decline was proximately related to the allegations in the case. As the *Dura* court noted, "the most logic alone permits this Court to say is that the inflated purchase price suggests that misrepresentation "touches upon" a later economic loss, as the Ninth Circuit found. However, to touch upon a loss is not to cause a loss, as 15 U.S.C. § 78u-4(b)(4) requires." Instead, as stated in the very opening of *Dura*, "A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss."

## VII.  ALLEGED INFLATION AND DAMAGES ASSUMING LIABILITY

73. The extent to which the restatement could have affected Veeco's stock price is at most limited to the issues related to TurboDisc's gross margins. Therefore the alleged inflation in the Veeco stock, assuming liability, cannot be greater than the market and industry adjusted price reaction on those dates, which indicates a maximum inflation per share of $3.09 until February 11, 2005 and an inflation of $0.76 until February 14, 2005.

---

[130] Feinstein Report, paragraphs 115-117.

[131] Feinstein Report, paragraph 115.

74. Further, the inflation per share earlier in the class period should take into account the amount of the restatement that could have been made at any earlier point in the class period. If one uses Dr Feinstein's methodology and adjusts the inflation per share using the proportion of the full revenue restatement that could have been made at the time that quarterly revenues were first announced, the maximum inflation per share, assuming liability would be:  $0.85 per share from April 26, 2004 to July 25, 2004, $2.14 per share from July 26, 2004 to October 24, 2004, and $3.09 from October 25, 2004 to February 10, 2005.  See *Exhibits 20, 21* and *22*.

75. Further we are being very conservative in this estimation of inflation per share, in that it does not take into account the positive stock price reaction that takes place on March 16 and March 18, 2005, when Veeco announces the restatement itself.  If one takes the $3.09 negative market-adjusted price reaction from February 11-14, 2005, and subtracts the positive $0.51 and $0.80 reactions on March 16 and 18, 2005 respectively, one arrives at a $1.79 net price reaction to the restatement related news.

> *Exhibit 20.*  *Maximum Alleged Inflation in Veeco's Stock Price Over the Alleged Class Period*
>
> *Exhibit 21.*  *Alleged Inflation Pattern Suggested by Restatement Over the Alleged Class Period*
>
> *Exhibit 22.*  *Inflation Pattern Suggested by Restatement of Veeco's Pre-Income Tax Over the Alleged Class Period*

## A. Bounceback Rule

76. An additional statutory limitation from PSLRA on damages for a share purchased during the alleged class period is what is informally known as the bounceback rule.  The limitation is equal to the purchase price minus the bounceback price.  The bounceback price for any share sold within 90 calendar days of February 11, 2005 would be equal to the average closing price from February 11, 2005 to the actual sale date.  The bounceback price for any share sold after 90 calendar days past February 11, 2005 would be equal to the average closing price over those 90 days.  If the inflation at purchase is greater than the bounceback limitation as calculated above, the damages awarded should be capped accordingly.

31

## B. Prejudgment Interest

77. Since the amount of damages, if any, that the jury will award is currently unknown and since the interest rate through the time of trial is still not fully known, we would be willing to calculate pre-judgment interest after a verdict is reached should that be helpful to the Court. We would use whatever interest rate (a statutory rate or a market rate) that the Court considers appropriate.

## VIII. THE EXPERT REPORT OF CANDACE L. PRESTON

78. In her expert report, Ms. Preston claims to opine on damages allegedly suffered by Veeco as a result of alleged breaches of fiduciary duty outlined in the Derivative Complaint. She claims the following items as components of damages to Veeco[132]:

> a. The direct costs incurred by Veeco as a result of the breaches of fiduciary duty alleged in the Complaint;
>
> b. The indirect costs to Veeco as a result of the breaches of fiduciary duty alleged in the Complaint including Veeco's exposure in the 10(b) Action; and
>
> c. The return of all compensation including salaries and the value of other remuneration paid to Defendants in this action during the Relevant Period.

79. Ms. Preston grossly overstates alleged damages in this action, applying inappropriate methodologies, relying on Dr. Feinstein's incorrect alleged inflation calculations, and double counting damages due to her lack of reconciling damage and settlement scenarios between the shareholder derivative action and the securities class action. In perhaps the most egregious error, Ms. Preston also assumes an alleged class period of November 3, 2003, through February 10, 2005 for the 10(b) action. As stated in earlier sections of this report, the actual alleged class period is April 26, 2004 through February 10, 2005, indicating that Ms. Preston has incorrectly added approximately six months.

---

[132] Preston Report, paragraph 7.

32

## A. Ms. Preston's Direct Costs

80. Ms. Preston correctly identifies $800,000 as the direct cost "related to the internal investigation of improper accounting transactions at TurboDisc."[133] Ms. Preston is also correct that Veeco's legal and insurance expenses increased by $1,100,000 from 2004 to 2005. [134] However, although she admits that this may not represent the amount of increased expenses directly related to the alleged fraud,[135] she nonetheless includes it in her final damage numbers. Ms. Preston provides no proof that this increase in legal and insurance expenses is related to the alleged fraud, nor is there any such indication in the SEC filing from which she obtains this number. The increase in legal and insurance expenses could alternatively be a result of factors completely unrelated to the alleged fraud. Without proof that this increase in legal and insurance expenses is a direct result of the alleged fraud, it is inappropriate to include it in any damages calculation.

## B. Ms. Preston's Indirect Costs

81. Ms. Preston claims that the appropriate measure of indirect costs and resultant damages is Veeco's potential exposure in the securities class action litigation.[136] She attempts to quantify this potential exposure by applying two crude volume models to Feinstein's damage per share calculations. However, not only are her procedures for calculating the potential aggregate damages flawed, she inappropriately estimates damages due pursuant to the shareholder derivative action as potential claimed damages in the securities class action litigation. We first address her methodology for calculating potential aggregate damages in the securities class action lawsuit.

82. Ms. Preston assumes a class period from November 3, 2003 to February 10, 2005. In fact, as stated in the March 21, 2006 *Order and Decision*, the correct Class Period is from April 26, 2004 to February 10, 2005. She also applies a constant inflation of $3.22 to this incorrect Class Period. Even assuming this $3.22 figure is correct, Ms. Preston ignores Dr.

---

[133] SEC Form 10-K for Veeco Instruments, Inc. filed March 1, 2006, p. 32.

[134] Ibid.

[135] Preston Report, paragraph 9: "To the extent that such on-going cost increases are the result of the actions alleged in the Complaint, they are appropriately included as damages in this action."

[136] Preston Report, paragraph 10.

Feinstein's complete inflation model, in which inflation builds from $0.88 at the beginning of the alleged Class Period to $3.22 as of October 25. In addition, rather than Dr. Feinstein's estimate of maximum inflation per share of $3.22, we find that $3.09 is a more accurate estimate of the market and industry adjusted price reaction from February 11-14, 2005, which is what Dr. Feinstein's damage estimate is based upon.

83. Ms. Preston further calculates the maximum potential exposure in the 10(b) action to be the "free float" (shares outstanding minus shares held by directors and officers and beneficial owners) multiplied throughout her erroneous class period by the maximum damage per share of $3.22. First, she ignores the point, which Dr. Feinstein makes clear, that his damage per share depends on when during the class period the share was bought. But this method, which she terms "high end" even though it is actually higher than what plaintiffs are claiming, assumes that every share (excluding insiders and beneficial owners) traded during the alleged Class Period, and was thus damaged. She herself admits this is not a likely scenario: "In my experience, it is unlikely that all of the shares included in the Free Float would be damaged."[137]  In fact, public records show that many institutions likely held shares from prior to the beginning of the alleged Class Period through after the end of the alleged Class Period. These shares would not be damaged, and should be subtracted from the Free Float in any maximum damages calculation.

84. In order to arrive at what she considers a more reasonable figure, Ms. Preston attempts to quantify shares purchased and held by reporting institutions over the alleged class period, and shares sold by reporting institutions to non-reporting institutions over the alleged class period.[138]  Aside from the fact that Ms. Preston still uses an incorrect class period to calculate this figure, her method for calculating shares sold by reporting institutions to non-reporting institutions is extremely crude and does not take into account publicly available data that can be used to estimate a more accurate number.[139]  She also assumes that the damages to institutions can be estimated merely by calculating the shares purchased and retained by institutions, while ignoring the fact that any sales of shares during the alleged class period out

---

[137] Preston Report, paragraph 12.

[138] Preston Report, paragraph 16.

[139] Preston Report, paragraph 17: Ms. Preston cites 3,676,923 shares sold by reporting institutions to non-reporting institutions, but gives no explanation regarding where she obtains or how she calculates this number.

of holdings from before the alleged class period allows the institution to benefit from the alleged fraud. Ms. Preston also neglects to account for benefits due to the alleged fraud for non-institutional holders of shares.

85. Further, while it is correct to attempt to adjust for possible hold-through, this calculation in no way represents a minimum or even likely exposure in the 10(b) action. This is because Ms. Preston's calculations assume that the case will go to judgment assuming full liability based on plaintiffs' damage theories, that the court will award damages accordingly, and that all eligible plaintiffs make a claim for their share of the award. This scenario is not guaranteed to happen, and there is a strong chance that the matter will settle before judgment for a much smaller amount. Indeed, no more than about 80 percent of shareholder class actions reach a settlement, and less than 1 percent of such cases make it through a trial and judgment and even fewer have verdicts in favor of the plaintiff[140]. The median settlement in these types of cases was about 2.2 percent of investor losses (which are a form of typical plaintiffs' damage estimates) in 2006.[141] The remaining cases are dismissed at the motion to dismiss or summary judgment stage. Even if the case proceeds to trial, the eventual award and disbursal of funds from the company may be much smaller than the damage figures claimed by plaintiffs. For all these reasons, Ms. Preston's purported "minimum aggregate exposure"[142] calculation is far from a minimum figure, and is in fact likely unreasonably high.

86. Ms. Preston also ignores two important points in the recovery process for alleged damages in securities class action. The first point is that there are other defendants besides the Company in the securities class action. If any defendant other than the company pays a portion of the hypothetical amount due from defendants in the securities class action, it would not be appropriate to claim that that party owes this amount to the derivative plaintiff, the company. Further, to the extent that the settlement would be partially paid by insurance, the alleged damages for the derivative action would be even lower.

---

[140] Dr. Elaine Buckberg, Dr. Ron Miller, and Todd Foster with former NERA Senior Consultant Dr. Adam Werner, "Recent Trends in Securities Class Action Litigation: Will Enron and Sarbanes-Oxley Change the Tides?" July 10, 2003: "Fully 80% of federal securities class action lawsuits end in settlement. Approximately 19% of cases are dismissed, and about 1% end in judgments."

[141] Todd Foster, Dr. Ronald I. Miller, and Dr. Stephanie Plancich , "Recent Trends in Shareholder Class Action Litigation: Filings Plummet, Settlements Soar," January 2, 2007.

[142] Preston Report, paragraph 12.

35

87. Finally, Ms. Preston concedes that in footnote two of her report that the Private Securities Litigation Reform Act provides for an offset to damages based on the 90-day average price following the disclosure of the alleged misstatements and/or omissions, but claims that no offset is necessary, as the 90-day average price of Veeco stock never rose above the price following the disclosure.[143] This is an egregious mischaracterization of the PSLRA "bounceback" rule, as it is commonly referred. The bounceback rule stipulates that damages for any purchases made during an alleged class period and retained past the end of the alleged class period are the smaller of the alleged inflation at purchase and the difference between the purchase price and the bounceback price. It is necessary that only the difference between the purchase price and the bounceback price is less than the alleged inflation at purchase for the bounceback rule to have an effect, not, as Ms. Preston states, that the 90-day average stock price must rise above the price following the disclosure. In fact, the bounceback rule does reduce damages if applied to the admittedly incorrect damage scenarios Ms. Preston describes in her report.

## C. Ms. Preston's Compensation Calculations

88. Ms. Preston's last component of damages is her estimation of the compensation paid to the Defendants in the Derivative Action. From an economic standpoint this may not represent a valid component of damages, as Veeco would have had to pay this compensation regardless of the alleged fraud. Even if compensation paid to defendants were a legally valid component of damages, Ms. Preston's calculation of the value of stock options granted to defendants may not be sound. In many instances, valuing employee stock options using the Black-Scholes and Trinomial models overstates their value, as employee stock options are much less liquid than options traded in a market. It is impossible to know her exact methodology and inputs, as this is not explained in her report text or exhibits, but if she does not make the appropriate liquidity adjustments, her calculations would likely overstate the value of the options received by Defendants.[144]

---

[143] Preston Report, footnote 2.

[144] See for example:

John Hull & Alan White, "How to Value Employee Stock Options," *Financial Analysts Journal*, Jan/Feb2004, Vol. 60 Issue 1, pp. 114-19.

### D. Conclusions on the Preston Report

89. Ms. Preston's inclusion of what she calls direct costs of the securities class action litigation and the compensation of Veeco directors in the total damage figure seems questionable. Further, Ms. Preston's largest component of damages, or what she calls indirect costs, is flawed in its calculation, uses alleged inflation figures which are too high, is estimated for an incorrect class period that starts approximately six months before the actual alleged class period, and uses an inappropriate accounting for all sales and purchases by reporting institutions, and an unexplained calculation of sales by reporting institutions to non-reporting institutions. Ms. Preston's indirect costs, even had they been correctly calculated, would be an inappropriate measure of damages due to the plaintiffs in the shareholder derivative action, as they are not representative of the amount of money that Veeco will ultimately have to pay to dispose of the securities class action litigation. For all these reasons, Ms. Preston's calculations and conclusions cannot be relied upon in any assessment of damages due to the shareholder derivative plaintiffs.

## IX.  CONCLUSION

90.  The Feinstein Report represents an incomplete and incorrect application of otherwise widely accepted theories and methodologies in calculating damages in securities class action lawsuits. A complete and correct application of such theories and methodologies yields different conclusions about damages due to the alleged fraud:

       a. Investors and analysts understood that revenues at Veeco and TurboDisc were driven by orders. Further, investors and analysts attributed TurboDisc's various order shortfalls over the alleged class period (separate from the restatement) to industry declines in the market for MOCVD machines.

       b. Analysts did not view the restatement as evidence of a failure on the part of Veeco to implement its strategy for TurboDisc. Instead, they viewed it as a temporary item of bad news, were pleased when TurboDisc rolled

---

Nalin Kulatilaka and Alan J. Marcus, "Valuing Employee Stock Options," *Financial Analysts Journal*, Nov/Dec 1994, Vol. 50 Issue 6, pp. 46-56.

out its next generation of MOCVD machines, or the GanZilla II, and as of the end of 2005, were optimistic that Veeco's TurboDisc strategy was working.

c.   TurboDisc constituted less than 20 percent of Veeco's business.  There is ample evidence that much of Veeco's price decline over the alleged class period was due to declining prospects in its other business segments.  In fact, prior to October 12, 2004, most of Veeco's stock price decline is consistent with industry factors as indicated by the stock price movements of its peer companies.  Further, its stock price decline after October 12, 2004 is consistent with a general industry decline in orders for MOCVD machines.

d.   Consequently, even if we assume that Veeco and its management are liable for the allegations, the maximum alleged inflation per share at the end of the alleged class period is the negative price reaction from February 11-14, 2005, or $3.09.  Further, as the restatement spans the first three quarters of 2004, the alleged inflation would have been lower at the beginning of the alleged class period, as Dr. Feinstein indicates in his analysis.

91. Regarding the conclusions drawn in the Preston Report, NERA's analysis has shown that Ms. Preston's calculations of damages in the shareholder derivative action are wholly unreliable, as they are methodologically and theoretically flawed.  In any case, the bulk of the damages in her calculation should become apparent in the disposition of the securities class action litigation, and need not be speculated on at this point in time.

38

## X.    MISCELLANEOUS

92. Our work is ongoing and our opinions are subject to revision based on new information (including new reports, depositions, or testimony by Plaintiffs' experts or other individuals), which subsequently may be provided to or obtained by us.

April 20, 2007

Vinita M. Juneja, Ph.D.